FILED

2004 MAR -4  PH 4: 25

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Anna Marie Ferrante, | ) | **CASE NO. 1:02CV1333** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| George M. Peters, et al., | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |

### Introduction

This matter is before the Court upon (1) Defendants George M. Peters and Richard

Collier's Motion for Summary Judgment (Doc. 48); (2) Defendants' Motion to Strike Expert

Report of Plaintiff's Expert Norman J. Raash (Doc. 71); and (3) Defendants' Motion to Strike

Plaintiff's Response to Defendants' Motion to Strike Report of Plaintiff's Expert Norman J.

Raasch (Doc. 76).  This case involves claims brought pursuant to 42 U.S.C. § 1983 for violations

of plaintiff Anna Ferrante's Fourth and Fourteenth Amendment rights, as well as numerous state

law claims, arising out of defendants' alleged use of excessive force in an incident involving

plaintiff and her husband, Michael Ferrante.  The issue presently before the Court is whether

1

defendant police officers Peters and Collier are entitled to qualified immunity with respect to plaintiff's state and federal claims.  For the following reasons, the Court (1) denies defendants' Motion to Strike Expert Report of Norman J. Raasch (Doc. 71); (2) grants defendants' Motion to Strike Plaintiff's Response to Defendants' Motion to Strike Report of Plaintiff's Expert Norman J. Raasch (Doc. 76); (3) grants defendants' Motion for Summary Judgment with respect to Counts One and Two of plaintiff's Complaint; and (4) remands Counts Three through Nine to state court.

**Facts**

Plaintiff Anna Ferrante[1] filed this Complaint in the Cuyahoga County Court of Common Pleas on June 26, 2002 against defendants George M. Peters and Richard Collier.  The matter was thereafter removed to this Court on July 2, 2002 on the basis of federal question jurisdiction.

Plaintiff's claims arise out of the events of November 10, 2001.  On that date, plaintiff and her husband Michael Ferrante were visiting a job site located at the intersection of East 149th Street and Lytton Street in Cleveland, Ohio.  (A. Ferrante Depo. at 21; M. Ferrante Depo. at 16-17).  Mr. Ferrante and his son are co-owners of the Perfect Pitch Construction Company, which is in the business of rehabilitating residential property.  (M. Ferrante Depo. at 6).  Perfect Pitch had secured a contract to rehabilitate a residence located at E. 149th and Lytton Streets and, on the date in question, plaintiff and her husband visited the residence to assess the progress of work.  (M. Ferrante Depo. at 16-17; A. Ferrante Depo. at 21).  Several subcontractors were also at

---

[1]     At the time the Complaint was filed, Michael Ferrante (Anna Ferrante's husband) was also named as a plaintiff.  On December 18, 2002, this Court entered an Order and Notice of Dismissal indicating that Mr. Ferrante had voluntarily dismissed his claims with prejudice.  (Doc. 14).

2

the site that day (including electricians Christopher Scarpitti and Alan Wisniewski and carpenters at 27, 36; M. Ferrante Depo. at 19-20).

Plaintiff testified that she and her husband parked their new, black Dodge Dakota truck on the street and entered the house. (A. Ferrante Depo. at 26; M. Ferrante Depo. at 20).  After taking a tour of the house, plaintiff and her husband drove to the Home Depot store in Mentor to purchase additional supplies requested by the electricians.  (A. Ferrante Depo. at 27-28; M. Ferrante Depo. at 22-24). They returned at approximately noon and began unloading the supplies into the house.  (A. Ferrante Depo. at 35-37; M. Ferrante Depo. at 27-28).  At that time, they noticed a rusted red pick-up truck with two occupants.  (A. Ferrante Depo. at 42-44; M. Ferrante Depo. at 29-30).  The truck slowed down by the Ferrantes' truck, pulled up alongside it, and then pulled away. (A. Ferrante Depo. at 42-44; M. Ferrante Depo. at 29-30).  Shortly thereafter, the red pick-up truck drove around the Ferrantes' truck again, stopped briefly, and the occupants looked squarely at Mr. Ferrante before moving on. (A. Ferrante Depo. at 54; M. Ferrante Depo. at 29-30). At that point, plaintiff and Mr. Ferrante began to become uncomfortable that the occupants of the pick-up truck might want to steal either the Ferrantes' supplies or their new Dodge truck.  (M. Ferrante Depo. at 31, 34; A. Ferrante Depo. at 53). When the pickup drove slowly by the Ferrantes' truck a third time, Mr. Ferrante became increasingly concerned and decided that he and plaintiff should leave immediately. (M. Ferrante Depo. at 32-35; A. Ferrante Depo. at 53-55).

Meanwhile, at approximately 12:06 p.m. on November 10th, Cleveland Police Dispatch received a call indicating that a man was flashing a gun in a residential area located at the intersection of E.149th and Lytton Streets.  (911 Dispatch Transcript at 1) (attached as Exhibit A-

3

2 to defendants' Motion for Summary Judgment).  Specifically, the caller (Mr. Jessie Presswood) stated that he had observed a man come out of a house with a pistol and then place the pistol in his truck. (911 Dispatch Transcript at 1).  Mr. Presswood described the man as a white male in his late 40's or early 50's, wearing a black sport jacket and standing approximately 5'9" tall.  (911 Dispatch Transcript at 4).  He further identified the man's truck as a black Dodge Ram pick-up truck with temporary tag number Z3099370. (911 Dispatch Transcript at 2-3). Mr. Presswood also confirmed that the house from which the man emerged was located at the corner of E. 149th and Lytton Streets and that a red van was parked in the front yard on the lawn. (911 Dispatch Transcript at 1).

Dispatch issued a priority-one call for assistance with a description of the suspect and his vehicle. (911 Dispatch Transcript at 7). Defendants, Cleveland Police Detective George Peters and Officer Richard Collier, responded to the call. (Peters Depo. at 165, 168, 209; Collier Depo. at 84-85).  Detective Peters was dressed in plain clothes and was driving an unmarked Ford Taurus. (Peters Depo. at 140). Officer Collier was dressed in full police uniform and drove a marked police cruiser. (Collier Depo. at 66-67).

Defendants Peters and Collier approached the intersection of E. 149th and Lytton and stopped side-by-side to assess the situation. (Peters Depo. at 176; Collier Depo. at 90-91). They observed a black Dodge truck and requested dispatch to verify the location and description of the suspect vehicle. (Peters Depo. at 177, 211; Collier Depo. at 92-93, 103). As dispatch was verifying this information, Peters and Collier observed plaintiff and Michael Ferrante leave the

4

residence and walk towards the truck.  (Peters Depo. at 211-212; Collier Depo. at 104). [2]

Defendants testified that they did not observe Mr. Ferrante with a gun or anything else in his hands and did not observe him doing anything illegal. (Peters Depo. at 215-216, 227; Collier Depo. at 106-107).  However, they believed Mr. Ferrante was acting suspiciously because Mr. Ferrante saw defendant Peters and then moved quickly into his truck. (Peters Depo. at 227).  At this point, defendants became concerned that Mr. Ferrante would leave the scene.  (Peters Depo. at 228, 232; Collier Depo. at 110).  Defendants moved in, positioning their cars on either end of Mr. Ferrante's truck. (Peters Depo. at 229; Collier Depo. at 119-121).  Neither defendant Peters nor defendant Collier had their sirens on when they moved in towards the Ferrrantes' truck. (Peters Depo. at 229, 245; Collier Depo. at 110).

The parties have differing versions of what happened next.  According to defendants, Peters and Collier exited their cars and moved to tactical positions behind their respective vehicles.  (Peters Depo. at 231; Collier Depo. at 123-125). They testified that, with guns drawn and pointed at Mr. Ferrante, they both clearly identified themselves as police officers and commanded the Ferrantes to raise their hands.  (Peters Depo. at 232, 240-41; Collier Depo. at 125-126).  Neither complied and, instead, both plaintiff and Mr. Ferrante ducked down inside the

---

[2]    Plaintiff does not dispute that Mr. Ferrante matches the physical description given of the suspect (i.e., white male, late 40's or early 50's, 5'9" tall), but claims that he was not wearing a black sport jacket as described by Mr. Presswood. (M. Ferrante Depo. at 22-23, 139-140; A. Ferrante Depo. at 31, 167-168).  In addition, plaintiff notes that the caller (1) described a black Dodge Ram truck while the Ferrantes' truck is a Dodge Dakota; and (2) wrongly identified several numbers in the vehicle's temporary tag number. (M. Ferrante Depo. at 137). In fact, Dispatch reported that the temporary tag number reported by Mr. Presswood matched a 1995 Buick with expired tags "somewhere in Bloomington, Ohio." (911 Dispatch Transcript at 7; Collier Depo. at 83).

5

cab of the truck.  (Peters Depo. at 241; Collier Depo. at 128-129, 132).

Mr. Ferrante then started the truck.  (Peters Depo. at 243; Collier Depo. at 134).
Defendants ordered him to shut the truck off, but Mr. Ferrante did not comply.  (Peters Depo. at
243- 244).  Instead, he put the truck in reverse and struck defendant Collier's police cruiser.
(Peters Depo. at 244; Collier Depo. at 134-135).  He then lurched forward and quickly
accelerated, despite defendants' commands that he stop the truck.  (Peters Depo. at 247; Collier
Depo. at 135).  Defendant Peters claimed that Mr. Ferrante drove the truck straight at Peters,
coming within inches of hitting him.  (Peters Depo. at 247, 275-276).  Defendants Peters and
Collier then fired at the truck, releasing eight to ten rounds.  (Peters Depo. at 249-255; Collier
Depo. at 135, 140).  Defendants maintain that they did not fire their guns until after Mr. Ferrante
accelerated the truck and began driving directly towards Detective Peters.  (Peters Depo. at 244,
247-250; Collier Depo. at 134-135).

Plaintiff and her husband have a different recollection.  Plaintiff testified that, after she
and her husband entered their truck, a blue Ford Taurus "came screeching around a corner," sped
up alongside of them, and "suddenly he just pulled in front and cut us off at an angle."  (A.
Ferrante Depo. at 60-62; M. Ferrante Depo. at 36-37).  She further testified that a "crazed looking
man" in "scruffy clothes" and jeans jumped out of the Taurus, pointed a gun at the Ferrantes, and
began screaming for them to "get out of the f--ing truck."  (A. Ferrante Depo. at 62-66; M.
Ferrante Depo.at 36-37).  Plaintiff testified that defendant Peters did not identify himself as a
police officer and neither defendant used their emergency lights or sirens when approaching the

6

truck.  (A. Ferrante Depo. at 62-67; M. Ferrante Depo. at 42).[3]

Plaintiff and Mr. Ferrante testified that she and her husband were terrified, in shock, and,

not knowing that the "crazed looking man" (i.e., defendant Peters) was a Cleveland Police

Officer, believed that their lives were in danger.  (A. Ferrante Depo. at 62-67; M. Ferrante Depo.

at 36-37).  They testified repeatedly that all they could see was a gun "as big as a cannon"

pointed straight at them.  (A. Ferrante Depo. at 65; M. Ferrante Depo. at 38).  When defendant

Collier's marked cruiser pulled in behind their truck, Mr. Ferrante believed that Officer Collier

was there to subdue defendant Peters and became fearful that they (the Ferrantes) would be

caught in the crossfire.  (M. Ferrante Depo. at 38-39).

Rather than complying with defendants' command to exit the truck, Mr. Ferrante slumped

down and pushed plaintiff onto the floor of the truck, so that they would be out of the gun's line

of fire. (A. Ferrante Depo. at 67; M. Ferrante Depo. at 38).  Mr. Ferrante then said to his wife, "I

don't know what to do." (M. Ferrante Depo. at 38; A. Ferrante Depo. at 67).  Plaintiff testified

that she responded "Start the car before he kills us." (A. Ferrante Depo. at 67).  Mr. Ferrante then

started the truck. (A. Ferrante Depo. at 67; M. Ferrante Depo. at 39).  Both plaintiff and Mr.

Ferrante testified that, prior to Mr. Ferrante putting the truck in reverse, "bullets started flying,"

as defendants fired shots directly at them.  (A. Ferrante Depo. at 67; M. Ferrante Depo. at 39).

One of the bullets shot out the truck's rear-view mirror.  (A. Ferrante Depo. at 67; M. Ferrante

Depo. at 39).

---

[3]      The electricians and carpenters present at the residence also testified that
defendants did not identify themselves as police officers or use their emergency
lights or sirens. (Klepacki Depo. at 59; Wisniewski Depo. at 35; Fliter Depo. at
37, 41, 44; Scarpitti Depo. at 26-27).

7

Mr. Ferrante then put the truck in reverse and bumped into defendant Collier's vehicle. (M. Ferrante Depo. at 43-44).[4] He then put the truck in drive and pulled around defendant Peters' Taurus. (M. Ferrante Depo. at 41-45). Throughout this time period, shots were fired at the Ferrantes' truck, impacting the truck's front windshield, passenger side door panel, front and rear tires, and back window. (M. Ferrante Depo. at 46, 104; Peters Depo. at 250-255; Collier Depo. at 140). Mr. Ferrante testified that he did not come close to striking either defendant Peters or defendant Collier. (M. Ferrante Depo. at 47-49).

The facts are largely undisputed regarding the ensuing pursuit of plaintiff and Mr. Ferrante. After the Ferrantes drove away, defendants returned to their vehicles and pursued them. (Peters Depo. at 279). Other Cleveland and Bratenahl police officers joined the pursuit as the Ferrantes drove onto the Route 2 expressway. A uniformed officer pulled alongside plaintiff's truck and motioned them to pull over. (M. Ferrante Depo. at 56). Plaintiff and Mr. Ferrante eventually stopped their truck on the berm approximately 1 mile from the Martin Luther King exit.

Other Cleveland officers approached the truck and forcibly removed plaintiff and Mr. Ferrante, allegedly throwing them down on the ground and handcuffing them. (A. Ferrante Depo. at 81-82; M. Ferrante Depo. at 38-39). After spending six hours in a holding cell at the City Jail,

---

[4]     Mr. Ferrante testified that he only lightly bumped Officer Collier's cruiser and that his Dodge truck showed no damage from this impact. (M.Ferrante Depo. at 43-45, 146). Defendants testified that they observed a split and numerous scratches and dents in the front bumper of Officer Collier's cruiser as a result. (Peters Depo. at 246; Collier Depo. at 138).

8

plaintiff was released with no charges.[5]  (A. Ferrante Depo. at 88-89).  Mr. Ferrante was booked

and charged with felonious assault and was later released on bond the next day.[6]  The criminal

charges against Mr. Ferrante were ultimately resolved through a plea agreement.

No gun was ever recovered. (Peters Depo. at 280-281).  Plaintiff testified that Mr.

Ferrante has never owned or possessed a gun.  (A. Ferrante Depo. at 48).  Neither plaintiff nor

Mr. Ferrante had ever been arrested or charged with a criminal offense prior to this incident.  (A.

Ferrante Depo. at 123; M. Ferrante Depo. at 152-153).

Plaintiff filed her Complaint in the Cuyahoga County Court of Common Pleas on June

26, 2002, and the defendants filed their Notice of Removal to this Court on July 11, 2002.   The

Complaint sets forth nine claims.  Count One alleges a claim under 42 U.S.C. § 1983 for

violations of plaintiff's Fourth and Fourteenth Amendment rights in connection with defendants'

---

[5]     Plaintiff testified that, after being released from the holding cell, she went to the
emergency room to obtain treatment for abrasions and bruises on her wrists and
the fronts of her legs. (A. Ferrante Depo. at 81-82).   However, in her Brief in
Opposition, plaintiff limits her excessive force claim to the events occurring at E.
149th and Lytton Streets, and not to any actions occurring during and subsequent
to the pursuit.

[6]     On December 3, 2001, the Cuyahoga County Grand Jury indicted Mr. Ferrante of
one count each of assault on a police officer (Ohio Rev. Code § 2903.11), failure
to comply with an order of a police officer (O.R.C. § 2921.331), possessing
criminal tools (O.R.C.§ 2923.24), and obstructing justice (O.R.C. § 2921.31). The
State then requested, and was granted, leave to dismiss the charges in order to re-
indict Mr. Ferrante and add additional charges. Plaintiff has alleged that the
Cuyahoga County Prosecutor's Office verbally offered a plea bargain to Mr.
Ferrante whereby all criminal charges against him would be dismissed if he
entered a guilty plea to a minor traffic offense and agreed to dismiss his civil suit
with prejudice.  Mr. Ferrante refused. Thereafter, on September 6, 2002, the
Cuyahoga County Grand Jury returned a second indictment, charging Mr. Ferrante
with two counts of assault on a police officer; one count of failure to comply with
an order of a police officer; one count of possessing criminal tools; and one count
of obstructing justice.

9

alleged excessive use of force and unreasonable seizure of plaintiff without probable cause. Count Two also alleges a claim under 42 U.S.C. § 1983 for violations of plaintiff's Fourteenth Amendment rights in connection with defendants' "malicious and sadistic" use of excessive force. Count Three alleges a claim of battery. Count Four alleges a claim of assault. Count Five alleges a claim of false imprisonment. Count Six alleges a claim of intentional infliction of emotional distress. Count Seven alleges a claim of negligent infliction of emotional distress. Count Eight alleges a claim of trespass to chattels. Count Nine alleges a claim of negligence and negligence per se. The Complaint further states that plaintiff is seeking compensatory and punitive damages in an amount to be determined at trial.

Defendants Peters and Collier have moved for summary judgment and to strike the report of plaintiff's expert, Norman Raasch. This Memorandum of Opinion and Order will address each of these Motions in turn.

I.      **Defendants' Motion to Strike Expert Report of Norman Raasch (Doc. 71) and Defendants' Motion to Strike Plaintiff's Response to Defendants' Motion to Strike Mr. Raasch's Expert Report (Doc. 76)**

In their Motion to Strike Expert Report of Norman Raasch (Doc. 71), defendants Peters and Collier argue that this Court should strike the report of plaintiff's expert, Norman Raasch, because (1) it is neither authenticated nor sworn to; and (2) it is not based upon personal knowledge. With regard to the first argument, defendants argue that Mr. Raasch's report dated August 13, 2003 is merely a letter and is, therefore, not in the form of sworn testimony as required by Fed. R. Civ. Proc. 56. With regard to the latter argument, defendants cite deposition testimony of Mr. Raasch indicating that, in preparing his report, his understanding of the facts was based entirely on information provided by plaintiff's former counsel and not on any

10

independent review of documents.  Defendants further rely on testimony from Mr. Raasch indicating that, because he had not yet conducted a review of the totality of the circumstances, he had not reached a "final position" concerning defendants' actions.

In response, plaintiff argues that defendants' Motion should be denied based on an attached Affidavit of Mr. Raasch dated February 17, 2004.  In this Affidavit, Mr. Raasch authenticates, and attaches as an Exhibit, his previously-filed expert report dated August 13, 2003.  In addition, Mr. Raasch avers that, subsequent to the preparation of his report, he reviewed numerous documents, including (1) the deposition transcripts of plaintiff, Mr. Ferrante, defendants Peters and Collier, and numerous other witnesses; (2) the police reports and dispatch tapes relative to the events of November 10, 2001; and (3) photographs of the scene of the incident as well as the Ferrantes' vehicle.  He then avers as follows:

> Having reviewed the above-referenced documents, my opinions rendered in the report of August 13, 2003, have not changed.  In fact, it is my professional opinion, within a reasonable degree of certainty, that the actions of Officers Peters and Collier on November 10, 2001, amounted to the excessive use of force.

(Rausch Aff. at ¶ 5) (attached to plaintiff's Response to defendants' Motion to Strike).

In response, defendants have filed a Motion to Strike Plaintiff's Response to Defendants' Motion to Strike Expert Report of Norman J. Raasch (Doc. 76).  Therein, defendants argue that Mr. Raasch's February 17, 2004 Affidavit is essentially a new expert report and that it should be stricken because (1) it is untimely under this Court's discovery deadlines; and (2) defendants have not had an opportunity to depose Mr. Raasch regarding the basis for his Affidavit.

The Court grants defendants' Motion to Strike Plaintiff's Response to Defendants' Motion to Strike Expert Report of Mr. Raasch (Doc. 76).  Mr. Raasch's Affidavit was not

submitted until well after this Court's discovery deadline.  Plaintiff has not argued or directed

this Court's attention to any authority indicating that this Affidavit constitutes a timely

supplementation to Mr. Raasch's August 13, 2003 report.  Moreover, defendants correctly note

that they were not able to question Mr. Raasch regarding his review of any of the factual

materials listed in his Affidavit.

       However, this Court nevertheless denies defendants' Motion to Strike Mr. Raasch's

August 13, 2003 Expert Report (Doc. 71).  With respect to defendants' argument that Mr.

Raasch's August 13, 2003 expert report should be stricken because it is not sworn testimony, the

Court finds that this argument is without merit in light of the fact that, although this report is

styled as a letter, it contains Mr. Raasch's signature. With respect to defendants' argument that

Mr. Raasch's report is not based on personal knowledge, the Court rejects this argument as well.

The Court finds that any issues regarding the materials that Mr. Raasch did or did not consider

and the "finality" of his position regarding defendants' conduct goes to the weight to be accorded

his August 13, 2003 expert report rather than its admissibility.  Accordingly, the Court denies

defendants' Motion to Strike Plaintiff's Expert Report (Doc. 71).

## II    Defendants' Motion for Summary Judgment

### Standard of Review

       Summary Judgment is appropriate when no genuine issues of material fact exist and the

moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376,

378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material

facts rests with the moving party:

12

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution

will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of [his] pleadings, but [his response], by
> affidavits or as otherwise provided in this rule, must set forth
> specific facts showing that there is genuine issue for trial. If he
> does not respond, summary judgment, if appropriate, shall be
> entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most

favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir.

1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th

Cir. 1985). However, the nonmoving party may not simply rely on its pleadings, but must

"produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d

at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence

13

on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

### Discussion

Defendants argue that there is no genuine issue of material fact that they are entitled to qualified immunity with respect to both plaintiff's federal and state law claims.  Plaintiff argues that there are numerous fact issues which preclude summary judgment in defendants' favor.  This Memorandum of Opinion and Order will address plaintiff's federal and state law claims separately.

### A.    Federal Claims (Counts One and Two)

As stated above, Count One of plaintiff's Complaint alleges violations of plaintiff's Fourth and Fourteenth Amendment rights in connection with defendants' alleged use of excessive force and unreasonable seizure of plaintiff without probable cause.  Count Two alleges violations of plaintiff's Fourteenth Amendment rights in connection with defendants' allegedly "malicious and sadistic" use of excessive force.

Defendants argue that they are entitled to qualified immunity with respect to these claims because their conduct did not violate a clearly established constitutional right of plaintiff. Defendants emphasize that plaintiff's federal claims relate only to the use of excessive force during the events occurring at E. 149th and Lytton Streets, and not during or subsequent to the ensuing police pursuit.  They then argue that plaintiff was not "seized" within the meaning of the Fourth Amendment at E. 149th and Lytton Streets because neither she nor her husband complied

14

with the defendants' commands and, instead, they fled the scene.  Because no seizure occurred, defendants maintain that plaintiff has no Fourth Amendment claim and can only pursue her excessive force claim under the Fourteenth Amendment.  Defendants then argue that plaintiff cannot succeed on this claim as a matter of law because defendants' conduct did not "shock the conscience," i.e., was not "malicious or sadistic."  Accordingly, defendants argue that their conduct did not violate plaintiff's clearly established constitutional right and, therefore, they are entitled to qualified immunity as a matter of law.

Plaintiff does not dispute that her excessive force claim is limited to the events at E. 149th and Lytton Streets but argues that a "seizure" did, in fact, occur at that location. Specifically, plaintiff argues that she was "seized" within the meaning of the Fourth Amendment when (1) her truck was surrounded by defendants' vehicles and defendant Peters pointed his weapon at her; and (2) defendants began shooting at her stationary truck.  Therefore, plaintiff claims that defendants' conduct should be analyzed under the Fourth Amendment's "objective reasonableness" standard.  Under this standard, plaintiff maintains that there is a genuine issue of material fact whether defendants' conduct was "objectively reasonable" in light of (1) defendant Peters' alleged failure to identify himself as a police officer; and (2) defendants' act of shooting numerous bullets into plaintiff's truck before it moved.   Plaintiff also argues that, even if this Court were to employ the Fourteenth Amendment's "shock the conscience" standard, there is a genuine issue of material fact whether defendants' conduct was "malicious and sadistic" in light of the fact that defendants' actions violated the Cleveland Police Department's own internal guidelines regarding the use of excessive force.  Thus, plaintiff maintains that a fact issue exists as to whether defendants violated her constitutional rights, rendering summary judgment in their

15

favor on the grounds of qualified immunity inappropriate.

"The doctrine of qualified immunity shields government officials from liability, as well as from suit, so long as their official conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hardy v. Jefferson Community College*, 260 F.3d 671 (6th Cir. 2001) citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, the Sixth Circuit recently explained:

> The Supreme Court has instructed that a qualified immunity inquiry generally entails two discrete analytical steps. As a threshold matter, we must ask whether the record, viewed most favorably to the plaintiff, establishes that 'the officer's conduct violated a constitutional right.' *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *see also Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). 'If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.' *Saucier*, 533 U.S. at 201, 121 S.Ct. at 2156. 'On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.' 533 U.S. at 201, 121 S.Ct. at 2156; *see also Burchett*, 310 F.3d at 942.

*Cherrington v. Skeeter*, 344 F.3d 631, 636 (6th Cir. 2003).

With regard to the question whether the right was clearly established, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Further, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

Therefore, this Court must first determine whether plaintiff has demonstrated the violation of a constitutionally protected right. As stated above, plaintiff herein alleges that her Fourth and Fourteenth Amendment federal constitutional rights were violated by defendants' use of excessive force during the incident at E.149th and Lytton Streets.

16

Because the Court must first determine whether a constitutional violation occurred, it must "begin by identifying the contours of the substantive right allegedly violated." *Armengau v. Cline*, 2001 WL 223857 (6th Cir. March 1, 2001). Prior to reaching this issue, however, the Court must ascertain the source of plaintiff's constitutional right not to be subjected to excessive force. As the Sixth Circuit has noted, "[t]he question of which amendment supplies [a plaintiff's] rights is not merely academic, for the standards of liability vary significantly according to which amendment applies." *Phelps v McCoy*, 286 F.3d 295, 299 (6th Cir. 2002). In the excessive force context, the Sixth Circuit explained further:

> While excessive force claims are often best analyzed under the Fourth Amendment's protection against unreasonable seizures, *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court has recently cautioned that not 'all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments[.]" *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 1L.Ed.2d 432 (1997). Instead, the Court noted that '*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' *Id.* Thus, while the Fourth Amendment 'objective reasonableness' analysis should be used in excessive force cases involving searches and seizures, where there is no search or seizure, the Supreme Court has held that the substantive component of the Fourteenth Amendment's due process clause is the most appropriate lens with which to view an excessive force claim. *County of Sacramento v. Lewis*, 523 U.S. 833, 843-44, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

*Darrah v. City of Oak Park*, 255 F.3d 301, 305-306 (6th Cir. 2001).

In order to make a showing of excessive force under the Fourth Amendment's "objective reasonableness" test, courts must view the reasonableness of any seizure in light of the totality of the circumstances and analyze the facts "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* at 307 (quoting *Graham*, 490 U.S. at 396). When conducting a reasonableness analysis, courts should pay particular attention to "the

17

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. *See also Darrah*, 255 F.3d at 307; *Ewolski v. City of Brunswick*, 287 F.3d 492, 507 (6th Cir. 2002). A determination of reasonableness must also consider the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. An officer's underlying intent is not relevant in evaluating "objective reasonableness:" "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397.

Under the Fourteenth Amendment, however, "a substantially higher hurdle must be surpassed to make a showing of excessive force." *Darrah*, 255 F.3d at 306. The substantive component of the Fourteenth Amendment's due process clause insulates citizens from the arbitrary exercise of governmental power. *Id. See also Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000). The test to determine when governmental conduct reaches this threshold is to ask whether the alleged conduct "shocks the conscience." *Darrah*, 255 F.3d at 306. The appropriate analysis under this test depends on the factual circumstances presented. *Lewis*, 523 U.S. at 851-53. As explained by the Sixth Circuit:

> In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical need), their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights.

18

[citations omitted].  In contradistinction, **in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, prison riot), public servants' reflexive actions 'shock the conscience' only if they involved force employed 'maliciously and sadistically for the very purpose of causing harm' rather than 'in a good faith effort to maintain or restore discipline.'**

*Claybrook*, 199 F.3d at 359 (emphasis added).  *See also Darrah*, 255 F.3d at 306.

The first question in the instant case, then, is whether the defendants' conduct at the intersection of E. 149th and Lytton Streets constitutes a seizure.  If so, this Court should apply the Fourth Amendment's "objective reasonableness" test as set forth in *Graham, supra*.  If not, this Court must determine whether defendants' conduct "shocks the conscience."  With regard to this latter test, both parties acknowledge that, under the factual circumstances presented herein, defendants' actions would be considered conscience-shocking only if they were employed "maliciously and sadistically for the very purpose of causing harm."

Both the United States Supreme Court and the Sixth Circuit have considered the meaning of the term "seizure" in the context of the Fourth Amendment on several occasions.  In general, a "seizure" occurs "only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 fn. 16 (1968)).   While the application of physical force to restrain movement may constitute a "seizure" even though ultimately unsuccessful, the Supreme Court has held that a show of authority must be accompanied by submission to that authority in order to constitute a "seizure." *California v. Hodari D.*, 499 U.S. 621, 625-626 (1991).  Moreover, the Supreme Court has noted that a "seizure" occurs only where a citizen's freedom of movement is restrained through "means

19

intentionally applied:"

> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but **only when there is a governmental termination of freedom of movement through means intentionally applied**.

*Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis added).

For example, in *Brower*, the police engaged in a high speed chase of decedent, who was driving a stolen car. The police fashioned a roadblock consisting of an 18-wheel tractor-trailer placed across both lanes of a two-lane highway, placed behind a curve in the road along which decedent was driving. The decedent crashed into the roadblock and died. The issue on appeal was whether his death could be held to be the consequence of an unreasonable seizure in violation of the Fourth Amendment. In answering this question in the affirmative, the Supreme Court noted that "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control." *Id.* at 596. The Court then explained that:

> . . . a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur. It may well be that respondents here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the barrier, but we do not think it practicable to conduct such an inquiry into subjective intent. [citations omitted] Nor do we think it possible, in determining whether there has been a seizure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (e.g., one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (e.g., one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. **We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result**.

20

*Id.* at 598-599 (emphasis added).  Because Brower "was meant to be stopped by the physical

obstacle of the roadblock – and . . . he was so stopped," the Court held that this was sufficient to

constitute a "seizure" under the Fourth Amendment.  *Id.* at 599.[7]

The Supreme Court further elaborated on the meaning of the term "seizure" in *California*

*v. Hodari D., supra.*  In that case, police officers chased a juvenile (Hodari) who discarded

cocaine while fleeing, just before being tackled by an officer.  In the juvenile proceedings

brought against him, Hodari moved to suppress the evidence relating to the cocaine, arguing that

it was the fruit of an illegal seizure.  The trial court denied the motion.  The California Court of

Appeals, however, agreed with Hodari, finding that he had been "seized" when he saw the officer

running towards him and that this seizure was unreasonable.  On appeal, the only issue presented

to the U.S. Supreme Court was whether, at the time he dropped the drugs, Hodari had been

"seized" within the meaning of the Fourth Amendment.

In finding in the negative, the Supreme Court first noted that, at common law, "the mere

grasping or application of physical force with lawful authority, whether or not it succeeded in

subduing the arrestee, was sufficient."  *Hodari*, 499 U.S. at 624.  However, the Court noted that:

---

[7]      In so holding, the Court explicitly distinguished the situation where a police car
seeks to stop a suspect by the show of authority represented by flashing lights and
continuing pursuit, but the suspect loses control of his car and crashes.  The Court
noted that this would not constitute a "seizure" because the suspect's termination
of movement was not caused "by the very instrumentality set in motion [by the
police]. . . in order to achieve that result." *Id.* at 597. *See also County of
Sacramento v. Lewis*, 523 U.S. 833 (1998) (finding no seizure where police
chased decedent, who was a passenger on a fleeing motorcycle, and decedent died
when motorcycle driver lost control and crashed).  By contrast, however, the
Court noted that, in the same factual situation, had the police car pulled up
alongside the fleeing car and sideswiped it, thereby producing the crash, then "the
termination of the suspect's freedom of movement would have been a seizure."
*Id.*

21

> [t]o say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is continuing arrest during the period of fugitivity. If, for example, [Officer] Pertoso had laid his hands upon Hodari to arrest him, but Hodari had broken away and had then cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

*Id.* at 625. Because Hodari was untouched by the officer at the time he discarded the cocaine, the Court found that he could not have been seized by means of application of physical force. Instead, the narrow question became "whether with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield." *Id.* at 626.

The Court held that it did not. Assuming the officer's pursuit of Hodari constituted a show of authority enjoining him to halt, the Court found that "since Hodari did not comply with that injunction he was not seized until he was tackled." *Id.* at 629. Because Hodari discarded the cocaine before he was tackled, the Court held that the cocaine was not the fruit of a "seizure" and his motion to exclude evidence was properly denied by the trial court.

Relying upon *Brower* and *Hodari* and several Sixth Circuit decisions involving police pursuits, defendants herein argue that there was no seizure in the instant case because neither plaintiff nor her husband complied with any of the defendants' commands and, in fact, they fled the scene. Moreover, defendants note that plaintiff does not allege that either defendant removed her from her car, placed her on the ground, handcuffed her, or transported her to the Justice Center. Thus, defendants contend that plaintiff was not "seized" within the meaning of the Fourth Amendment by either the application of physical force or a show of authority coupled with submission.

22

Plaintiff argues that all the cases relied upon by defendants are distinguishable because the unconstitutional conduct at issue herein occurred prior to any police pursuit of plaintiff and her husband. Rather, plaintiff agues that defendants' misconduct occurred at E. 149th and Lytton Streets and that two events occurred at that location which constitute a "seizure." First, plaintiff maintains that a seizure occurred when the Ferrantes' truck was surrounded and defendant Peters pointed his weapon at plaintiff. Second, plaintiff argues that a seizure occurred when the defendants began shooting at the Ferrantes' stationary vehicle.

In support of this argument, plaintiff relies principally on *Fisher v. City of Memphis*, 234 F.3d 312 (6th Cir. 2000). In that case, a police officer stopped to speak to two young women in the middle of the street. As they spoke, the officer noticed a vehicle approaching in their direction. To avoid being hit, the two women jumped onto the curb and the officer jumped onto the hood of his police car, simultaneously firing his gun at the car. The bullet went through the driver's side window and hit the passenger, Elita Fisher.

Ms. Fisher filed suit against the officer pursuant to 42 U.S.C § 1983, alleging deprivations of her Fourth, Eighth and Fourteenth Amendment rights. The district court granted summary judgment in defendant's favor on plaintiff's Eighth and Fourteenth Amendment claims, but found a genuine issue of material fact with respect to plaintiff's Fourth Amendment claim. At trial, the jury reached a verdict for plaintiff. Defendant appealed, arguing (among other things) that the district court erred in analyzing plaintiff's claim as arising under the Fourth Amendment.

The Sixth Circuit first noted that, under *Brower*, a violation of the Fourth Amendment requires an intentional acquisition of physical control. Thus, "a seizure occurs even when an

23

unintended person or thing is the object of the detention or taking, so long as the detention or

taking itself is willful." *Id.* at 318.  In finding that defendant "seized" Fisher, the court reasoned:

> Here, [the] car was the intended target of Defendant's intentionally applied exertion of
> force.  By shooting at the driver of the moving car, he intended to stop the car, effectively
> seizing everyone inside, including the Plaintiff.  Thus, because the Defendant 'seized' the
> Plaintiff by shooting at the car, the district court did not err in analyzing the Defendant's
> actions under the Fourth Amendment.

*Id.* at 318-319.

In the instant case, the Court would agree that *Fisher* supports a finding that plaintiff

Ferrante had been "seized" were it not for the Sixth Circuit's subsequent decision in *Adams v.*

*City of Auburn Hills*, 336 F.3d 515 (6th Cir. 2003).  In *Adams*, the police sought to stop the

plaintiff from leaving a motel, where a disturbance occurred involving plaintiff's ex-girlfriend.

As plaintiff drove towards the motel exit, a police officer walked in front of plaintiff's car with

his gun in one hand and his other hand up for plaintiff to stop.  Plaintiff stopped the vehicle and

stood halfway outside the car with his left hand on the top of the door and his right hand on top

of the car.  Plaintiff asked the officer if he had broken any law and the officer replied that he had

not.  Plaintiff then told the officer that he was going to leave.

The officer yelled for plaintiff to get out of the car three times and held his gun near the

driver's side window.  When plaintiff did not move, plaintiff claims that the officer fired two

shots into the driver's side door.  Plaintiff drove away and the officer fired two more shots at the

car's left rear wheel and mud flap.  Plaintiff drove to his mother's house and subsequently

surrendered.

Plaintiff later filed suit against numerous defendants pursuant to § 1983, alleging

violations of his Fourth, Fifth, Eighth and Fourteenth Amendment rights.  Defendants moved for

24

summary judgment, which the district court granted on all counts except plaintiff's Fourth Amendment claim against the officer who shot at him.

On appeal, the sole issue before the Sixth Circuit was "whether Officer Backstrom, by shooting at Adams's car, violated Adams's Fourth Amendment rights." *Id.* at 518.  The court found that no such violation occurred because shooting at a fleeing felon, but missing, is not a "seizure" within the meaning of the Fourth Amendment.  In so finding, the court relied heavily upon *Cameron v. City of Pontiac*, 813 F.2d 782 (6th Cir. 1987), in which the mother of the deceased fleeing suspect filed a § 1983 claim against police officers when the police chased the decedent (and shot at him several times but never hit him) and the decedent ran onto a busy expressway and was fatally struck by a motor vehicle.  The *Adams* court quoted the decision in *Cameron* as follows:

> 'Cameron was not seized by [officer defendants].  Cameron elected to flee, not to be restrained.  The officers' show of authority by firing their weapons, while designed to apprehend Cameron, did not stop or in any way restrain him. . . . Cameron's freedom of movement was restrained only because he killed himself by electing to run onto a heavily traveled, high speed freeway.  The use of deadly force standing alone does not constitute a seizure, and absent an actual physical restraint or physical seizure, the alleged unreasonableness of the officers' conduct cannot serve as a basis for a § 1983 cause of action anchored in the Fourth Amendment.'

*Id.* at 519-520 (quoting *Cameron*, 813 F.2d at 785).

The court then applied *Cameron* to the facts before them and found no seizure, noting specifically that the officer's firing at plaintiff's car did not impair plaintiff's movement because plaintiff was not hit by the officer's bullets and was able to leave the scene unharmed despite the officer's use of his firearm.  On this basis, the court found that the Fourth Amendment was not implicated.

25

In the course of its decision in *Adams*, the Sixth Circuit does not refer to or discuss its previous decision in *Fisher*. However, it appears that it must have considered *Fisher* distinguishable because the plaintiff in that case was, in fact, hit by one of the defendant's bullets and the automobile in which she was a passenger was immobilized. Indeed, in another recent "seizure" case, the Sixth Circuit cited *Fisher* as standing for the proposition that the "intentional application of force which immobilized [an] automobile effectively seized all passengers." *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002).

Applying the above precedent to the facts of the instant case viewed in light most favorable to plaintiff, the Court finds that plaintiff Ferrante was not "seized" for Fourth Amendment purposes at the intersection of E. 149th and Lytton Streets. Unlike the plaintiff in *Fisher*, plaintiff Ferrante was not immobilized or physically harmed by defendants' alleged conduct at the intersection. To the contrary, plaintiff was able to (and did) leave the scene unharmed. This renders the instant case more akin to *Adams*, where no seizure was found under similar factual circumstances.

The only other possible basis for finding a "seizure" is the fact that defendants positioned their cars on either end of plaintiff's vehicle for the purpose of preventing her escape, combined with defendants' acts of pointing and discharging their guns at plaintiff and her husband. Again, the Court finds that this conduct does not rise to the level of a "seizure" under the precedent discussed above. First, the above conduct cannot be characterized as "application of physical force" because at no point at the intersection did defendants actually touch or lay hands upon plaintiff or her vehicle. Second, the above conduct cannot constitute a seizure on the basis of the defendants' "show of authority" (i.e., blocking plaintiff's vehicle and firing their weapons) for

26

the reason that plaintiff did not submit to that authority.  In this respect, *Brower* (the roadblock

case) is distinguishable.  While the Supreme Court in *Brower* found the roadblock in that case to

have resulted in a "seizure," the Court expressly noted on several occasions in its opinion that,

not only was Brower meant to be stopped by the roadblock, he was in fact stopped by that

obstacle.  *See Brower*, 489 U.S. at 599 (stating that "Brower was meant to be stopped by the

physical obstacle of the roadblock – and . . . he was so stopped," and finding that the complaint

sufficiently alleged a seizure because it alleged that the police "sought to stop Brower by means

of a roadblock and succeeded in doing so").

Based on the above, the Court finds that it is compelled to conclude that plaintiff was not

"seized" within the meaning of the Fourth Amendment by defendants' alleged conduct at E.

149th and Lytton Streets.  Thus, the Court further finds that plaintiff's federal claims do not

implicate the Fourth Amendment and that defendants are entitled to summary judgment in their

favor as a matter of law on Count One of plaintiff's Complaint to the extent it alleges a violation

of her Fourth Amendment rights.

Having found that plaintiff was not "seized" at E. 149th and Lytton Streets, the Court

must then analyze plaintiff's excessive force claim under the substantive component of the

Fourteenth Amendment's due process clause.  As discussed *supra,* the applicable standard under

that Amendment is whether a governmental actor's conduct "shocks the conscience." *Darrah,*

255 F.3d at 306.  Specifically, in a rapidly evolving, fluid and dangerous situation such as the

one presented herein, the defendants' conduct will "shock the conscience" only if that conduct

"involved force employed 'maliciously and sadistically for the very purpose of causing harm'

rather than 'in a good faith effect to maintain or restore discipline.'" *Claybrook*, 199 F.3d at 359

(quoting *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)).

Defendants argue that, even assuming plaintiff's allegations to be true, no rational fact-finder could find their conduct to be "malicious or sadistic." Specifically, defendants maintain that, given the information relayed by Dispatch and the fact that both Mr. Ferrante and his vehicle matched the description given in all material respects, they reasonably believed that Mr. Ferrante was armed and potentially dangerous. Moreover, they argue that plaintiff and Mr. Ferrante's actions of ducking down in their truck reasonably caused defendants to believe that they might be reaching for a weapon. In this context, defendants maintain that their use of force was reasonable under the circumstances and constituted a good faith effort to maintain discipline, rather than a malicious and sadistic use of force for the very purpose of causing harm. In addition, as further support for their argument, defendants rely upon the report of their expert, Samuel Faulkner, who avers that defendants used reasonable force and reasonable tactics and, therefore, could not have been acting maliciously or sadistically. (Faulkner Report at 9).

Plaintiff maintains that there is a genuine issue of material fact on this issue in light of the fact that (1) the Ferrantes were not doing anything illegal or endangering anyone's lives when the defendants began shooting at them; (2) the defendants intended not merely to immobilize or injure them, but to kill them; and (3) defendants' actions violated their own departmental guidelines regarding the use of deadly force. Moreover, plaintiff emphasizes that the escalation of the situation was caused entirely by defendant Peters failure to identify himself as a police officer.[8]

---

[8]      It is not entirely clear, but it appears that plaintiff may also be relying upon the August 13, 2003 report of its expert, Norman Raasch. Therein, Mr. Raasch avers that defendants' actions "were unreasonable, contrary to standard and acceptable

28

The Court agrees with defendants and finds that no rational fact-finder could find that defendants Peters and Collier acted with conscience-shocking malice or sadism. As both parties concede, the situation was a tense, uncertain, and potentially dangerous one which rapidly evolved and escalated over an extremely short time period. The defendants had no reasonable opportunity for deliberation and were called upon to make an instantaneous judgment call. Although in hindsight it seems that defendants could have handled the situation better (perhaps most importantly by clearly identifying themselves as police officers), the Court finds that no rational fact-finder could conclude that defendants acted with malicious or sadistic purpose, particularly given the fact that defendants were relying on information from Dispatch that the suspect (who matched Mr. Ferrante's description) had a gun in his truck and was potentially dangerous.

Moreover, as defendants correctly note, the fact that their conduct may have violated Cleveland Police Department guidelines regarding use of deadly force does not compel a different result.[9] The Sixth Circuit has held that a violation of an internal departmental policy or

---

police practice and as a result, amounted to excessive force." Raasch Report at 5. Although Mr. Raasch's report contains his opinions regarding the unreasonableness of defendants' alleged conduct, it does not set forth an opinion that said conduct was "malicious or sadistic." Thus, the Court finds that Mr. Raasch's August 13, 2003 report is not relevant to this particular issue.

[9]  The Cleveland Police Department guidelines regarding "Use of Deadly Force" provide that "[p]olice officers shall not use deadly force to affect the arrest or prevent the escape of a person, unless the person presents a threat of death or serious bodily injury." See Exh. 4 to plaintiff's Brief in Opposition. In addition, this policy also provides that "[f]iring at or from moving vehicles is rarely effective and is extremely dangerous to innocent persons . . . Unless the occupants of the vehicle are using deadly force against the officer or another person by means other than the vehicle, or it is clear that the vehicle itself is being used as a deadly force, firing a weapon at a moving vehicle is prohibited." Id.

29

police order is not sufficient in and of itself to demonstrate a constitutional violation. *See Claybrook*, 199 F.3d at 360 (finding that "even if. . . the actions of the three defendant patrolmen violated departmental policy or were otherwise negligent, no rational fact finder could conclude . . . that those peace enforcement operatives acted with conscience-shocking malice or sadism"); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992) (finding that whether or not defendant police officer had violated city policies regarding use of deadly force was not determinative because "city policies do not determine constitutional law" and "[u]nder § 1983, the issue is whether [defendant] violated the Constitution, not whether he should be disciplined by the local police force").

Accordingly, based on the above, the Court finds that there is no genuine issue of material fact on this issue and that defendants are entitled to summary judgment in their favor with respect to Count Two of plaintiff's Complaint, as well as Count One to the extent it alleges excessive force under the Fourteenth Amendment.

**B.      State Law Claims (Counts Three through Nine)**

As set forth *supra*, Counts One and Two of the Complaint are the only counts which provide this Court with subject matter jurisdiction over the instant case.  Counts Three through Nine plead purely state-law causes of action and none of the parties have argued that any of these counts provide an independent basis for this Court to exercise subject matter jurisdiction. Because this Court has granted summary judgment in defendants' favor with respect to Counts One and Two, the Court will remand the remaining seven counts in the Complaint to state court pursuant to 28 U.S.C. § 1367.

In pertinent part, 28 U.S.C. § 1367 provides:

30

(c) The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -

\* \* \*

(3) the district court has dismissed all claims over which it has original jurisdiction.

28 U.S.C. § 1367(c).  The Sixth Circuit has held that where, as in the instant case, federal issues are dismissed before trial, district courts should decline to exercise pendent jurisdiction over state law claims.  *Gaff v. Federal Deposit Insurance Corp.*, 814 F.2d 311, 319 (6th Cir. 1987).

Accordingly, the Court grants summary judgment in defendants' favor with respect to Counts One and Two of plaintiff's Complaint and remands the remaining Counts Three through Nine to state court.

IT IS SO ORDERED.


PATRICIA A. GAUGHAN
United States District Judge

31